723 A.2d 1226 (1999)
Lloyd WALLACE, individually and as Administrator of the Estate of Theresa R. Wallace, deceased, and as Administrator Ad Prosequendum for Theresa R. Wallace, deceased, and for the next of kin of Theresa R. Wallace, deceased, Plaintiff-Appellant,
v.
FORD MOTOR COMPANY, Defendant-Respondent.
Conti-Causeway Ford & Lincoln Mercury, Defendant/Third-Party Plaintiff-Respondent,
v.
Frank Tremmer t/a Cheers Pub, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued January 27, 1999.
Decided February 19, 1999.
*1227 Richard C. Swarbrick, Piscataway, for plaintiff-appellant.
Bernard A. LeRoe, Livingston, for respondents (Dobis & Reilly, attorneys; James S. Dobis and Mr. LeRoe, on the brief).
Before Judges KING, NEWMAN and FALL.
The opinion of the court was delivered by NEWMAN, J.A.D.
In this product liability case, plaintiff appeals from the order denying a motion for reconsideration, the judgment of no cause of action entered in favor of defendants Ford Motor Company and Conti-Causeway Ford & Lincoln Mercury and the order denying a motion for a new trial and/or judgment N.O.V. and/or mistrial. We affirm.

I.
This lawsuit was based on an accident that took place about 1:00 a.m. on Saturday, September 16, 1989. Theresa R. Wallace (decedent) was alone in her 1989 Ford Mustang, driving on Bordentown Avenue in Sayreville, New Jersey. At a curve in the road, decedent lost control of her car. The Mustang rolled over several times, and she was ejected through the car's sunroof. She landed on a parked vehicle and died instantly of a fractured skull.
Lloyd Wallace (plaintiff), on behalf of his deceased twenty-two-year-old daughter, filed a wrongful death, products liability action against Ford Motor Company (Ford), which manufactured decedent's car, and Conti-Causeway Ford & Lincoln Mercury (Conti-Causeway), which sold this new car to decedent in April 1989. Plaintiff's cause of action was predicated on the fact that, at some point in the accident, the right rear axle had snapped and the right rear wheel had disconnected from decedent's car. Plaintiff alleged a manufacturing defect in the right rear axle which caused a wobble in the right rear wheel, which eventually led to the shear-fracture found in the right rear axle after the accident. Plaintiff asserted that this axle snapped, and this caused decedent to lose control of her car.
Ford and Conti-Causeway (defendants) maintained that decedent lost control of her car at the curve because she was drunk, (.l68 blood alcohol content) and speeding at seventy miles per hour in a fifty mile per hour zone. Rather than causing the roll-over accident, defendants asserted that the right rear axle fractured after the accident began, when the car, which became airborne several times, landed on its right rear wheel during one of the rollovers. The force of this impact with the pavement fractured the right rear axle, disconnecting the right rear wheel.
The first two questions # 1 and # 2 on the eight-question verdict sheet asked this of the jury:
*1228 1. Was the axle defective while under the control of Ford Motor Company and/or Causeway Ford?
YES ________ NO ________
IF YOUR ANSWER IS "NO" TO QUESTION # 1, THEN CEASE YOUR DELIBERATIONS AND RETURN YOUR VERDICT TO THE COURT.
IF YOUR ANSWER IS "YES" TO QUESTION # 1, PROCEED TO ANSWER QUESTION # 2.
2. Was the defect in the axle a proximate cause of the accident of September 16, 1989?
YES ________ NO ________
IF YOUR ANSWER IS "NO" TO QUESTION # 2, THEN CEASE YOUR DELIBERATIONS AND RETURN YOUR VERDICT TO THE COURT. IF YOUR ANSWER IS "YES" TO QUESTION # 2, PROCEED TO ANSWER QUESTION # 3.
The jury answered "no" to the first question, finding that the right rear axle in decedent's car was not defective while under the control of defendants. In view of this answer, the jury did not have to determine if this alleged defect was a proximate cause of the accident, nor did they have to decide if decedent was negligent or if her negligence was a proximate cause of the accident.
On appeal, plaintiff raises the following points:
POINT I PLAINTIFF'S MOTION FOR JUDGMENT BASED ON THE ADMISSIONS OF LIABILITY IN THE REQUESTS FOR ADMISSIONS SHOULD HAVE BEEN DEEMED ADMITTED FOR TRIAL PURPOSES
POINT II WITHOUT WAIVER OF PLAINTIFF'S CONTENTION THAT A JUDGMENT N.O.V. SHOULD HAVE BEEN ENTERED IN HIS FAVOR, THE TRIAL JUDGE'S TREATMENT OF THE PLAINTIFF AND HIS ATTORNEY WARRANTS REVERSAL
POINT III NO EVIDENCE OF ALCOHOL INTOXICATION AGAINST DECEDENT SHOULD HAVE BEEN PERMITTED IN THIS CASE AND IT WAS REVERSIBLE ERROR BY THE COURT TO ALLOW IT
POINT IV THE TESTIMONY OF DEFENSE EXPERT WITNESSES, KENT, EISENBERG AND VOLLMERHAUSEN, SHOULD HAVE BEEN STRICKEN
POINT V SHOULD THE APPELLATE COURT DENY PLAINTIFF'S MOTION FOR JUDGMENT N.O.V. AND/OR MISTRIAL AND OTHER RELIEF SOUGHT, THE PLAINTIFF IS ENTITLED TO A NEW TRIAL UNDER R. 4:49-1 ET. SEQ.
POINT VI PLAINTIFF PROVED A CASE OF BREACH OF EXPRESS AND IMPLIED WARRANTIES AND SHOULD HAVE RECEIVED JUDGMENT OF LIABILITY AGAINST DEFENDANTS ON THOSE ISSUES ALONE
POINT VII THE TRIAL JURY EXPERIMENTED WITH THE EVIDENCE IN THE JURY ROOM (PARTICULARLY THE AXLE, WHEEL AND ITS PARTS) AND PLAINTIFF'S MOTION FOR RECONSIDERATION AND NEW TRIAL SHOULD HAVE BEEN GRANTED
POINT VIII THE "NET OPINIONS" OF DEFENSE COUNSEL IN THEIR DOCUMENTS (THEY WERE NOT EXPERT REPORTS) SHOULD HAVE BARRED THEIR TESTIMONY ALONG WITH THE OUTSTANDING COURT ORDERS WHICH WERE VIOLATED, AND THE EVIDENCE USED AS THE FOUNDATION OF THEIR OPINION WAS TOO REMOTE AND NOT PROPERLY FOUNDED
POINT IX THE ADMINISTRATION OF FINES AGAINST WALLACE'S ATTORNEY FOR ALLEGED CONTEMPT AND THE INTIMIDATION OF HIS ATTORNEY BOTH IN AND OUT OF THE PRESENCE OF THE JURY WAS A GROSS MISCARRIAGE OF JUSTICE UNDER THE LAW AND AN ABUSE OF DISCRETION
*1229 WHICH WARRANTS REVERSAL AND REMISSION OF FINES
After a review of the trial record, certain videotapes offered into evidence, the briefs and argument thereon and the applicable law, we are satisfied that the issues raised, except for one raised under Point V concerning the viability of the defense of intoxication to a product liability cause of action, are clearly without merit, warranting only the following discussion. R. 2:ll-3(e)(l )(C) & (E).
[Points I, II, III, IV, part of Point V, VI, VII, VIII, and Point IX have been omitted for publication purposes].
Plaintiff makes a vague reference to his "arguments regarding whether intoxication can be used as a defense in product liability cases." He notes that it cannot be used as a defense to product liability cases in the work place, citing Suter v. San Angelo, 81 N.J. 150, 158, 406 A.2d 140 (1979), but that no mention is made to a non-workplace environment such as this automobile product liability action. Plaintiff contends the defense of intoxication should be unavailable here as well.
The Products Liability Act (Act), N.J.S.A. 2A:58C-1 to -7, was enacted on July 22, 1987. It applies to all product liability actions filed after its enactment date. Becker v. Baron Bros., 138 N.J. 145, 151, 649 A.2d 613 (1994).
"A plaintiff's conduct in using a product may implicate several distinct legal issues," in that it "may relate to the existence of a defect, the issue of causation, or comparative fault." William A. Dreier, Hannah G. Goldman & Eric D. Katz, New Jersey Products Liability & Toxic Torts Law, § 16:3 at 385 (1998) (hereafter Dreier ). See Jurado v. Western Gear Works, 131 N.J. 375, 387, 619 A.2d 1312 (1993). Whether a product has a manufacturing defect or design defect "focuses on the condition of the product as it left the control of the manufacturer" and, therefore, the conduct of an injured plaintiff "which occurs at some time after that reference point" is not relevant in determining the existence of a manufacturing defect or design defect. Grier v. Cochran Western Corp., 308 N.J.Super. 308, 324-25, 705 A.2d 1262 (App. Div.1998). See, e.g., Johansen v. Makita USA, Inc., 128 N.J. 86, 101, 607 A.2d 637 (1992) (noting that "[b]ecause the risk-utility analysis is based on the premise that a product is defective if it is dangerous when marketed, the post-marketing conduct of one plaintiff cannot inform that determination").
However, a plaintiff's conduct may be relevant to the "question of proximate cause," in that a jury may find that plaintiff's conduct "had been the sole cause of the accident." Johansen, supra, 128 N.J. at 102-03, 607 A.2d 637. See Grier, supra, 308 N.J.Super. at 325, 705 A.2d 1262 (concluding that, while evidence of plaintiff's post-marketing conduct was "irrelevant to the question of whether the product was defective," such conduct may be considered "on the issue of proximate cause").
While the "doctrine of comparative fault... focuses on the plaintiff's conduct in contributing to the occurrence of an accident," at present there is, in New Jersey, "no case law directly addressing the application of comparative negligence principles in cases alleging product defect where the plaintiff's conduct was a factor in the happening of the accident but not because of his or her use of the product." Dreier, supra, § 16:3-2 at 386 and § 16:5 at 387. However, there appears to be no obstacle to considering plaintiff's "conduct ... in the happening of the accident," even though it is "unrelated to a product's use:"
For example, the plaintiff may have been speeding in a vehicle and that speed might have been a cause of an accident which was also caused by a defect in the vehicle. The plaintiff could not be said to have proceeded in the face of a known risk if he or she did not know of the defect in the vehicle.... In these examples there are multiple causes for an accident or injury and there is no reason not to apply the usual comparative negligence rules for concurrent fault. For these product-unrelated causes, there should be no bar to recognizing the plaintiff's conduct.
[Id. § l6:5 at 387-88.]
*1230 Under New Jersey law, "evidence of alcohol consumption" by the injured plaintiff prior to the accident may be admissible "in a products liability case" because such evidence may be "relevant ... to the issue of proximate cause." Hulmes v. Honda Motor Co., 936 F.Supp. 195, 201 (D.N.J.1996), aff'd, 141 F.3d 1154 (3d. Cir.1998), cert. denied, ___ U.S. ___, 119 S.Ct. 49, 142 L. Ed. 2d 38 (1998).
Swajian v. General Motors Corp., 916 F.2d 31 (1st Cir.1990), is especially persuasive because it factually mirrors this case. On June 5, 1986, Maurica Swajian (Mrs. Swajian) was driving her 1986 GMC "when the vehicle began to sway, went out of control, and rolled over." Id. at 33. Mrs. Swajian was killed when she was thrown from the vehicle. Ibid. After this one-vehicle accident, the right rear axle of Mrs. Swajian's vehicle was found to be fractured. Ibid. Given this, Gregory Swajian (Swajian), Mrs. Swajian's husband, filed a products liability action against General Motors Corporation (GMC), based upon "defects in the manufacture and design of the right rear axle." Id. at 32-33. Swajian alleged that the right rear axle "failed during normal operation thereby causing a rollover accident resulting in his wife's death." Id. at 33. Among other things, GMC countered that the "vehicle rollover was caused solely by driver error as a result of Mrs. Swajian's intoxication." Ibid.
The main factual dispute concerning the accident itself was "whether the axle fractured before the rollover sequence began," i.e., "whether the right rear wheel separated before the rollover began or after it was already in progress." Id. at 33, 35. Daniel Mitchell, the driver closest to Mrs. Swajian's vehicle at the time of the accident, testified that Mrs. Swajian's vehicle "passed him in a normal manner, and when he next saw it, it was in the process of flipping over." Id. at 33. Mitchell also testified that he "could not recall whether the right rear wheel was still attached to the vehicle when he saw it flipping," in that he "never saw the wheel leave the vehicle and could not recall whether it was still on the vehicle when he saw it in the process of flipping over." Id. at 33, 35. Finally, Mitchell testified that he "became aware of the [right] wheel only when his passenger, Kim Gallante, cautioned him about the wheel, which was rolling across the roadway." Id. at 33.
At trial, Swajian's expert witnesses testified that the right rear axle "failed as a result of a fatigue fracture." Id. at 33. This, of course, supported Swajian's position that the "right rear wheel separated before the rollover began," which meant that the right rear axle "failed during normal operation thereby causing ... [the] rollover accident resulting in his wife's death." Id. at 33, 35.
Prior to trial, GMC took the position that the "vehicle rollover was caused solely by driver error as a result of Mrs. Swajian's intoxication." Id. at 33. In support of its position that the axle had not fractured before the rollover sequence began, GMC had evidence that, after work on the day of her accident, Mrs. Swajian had "consumed a number of alcoholic beverages." Ibid. "Immediately following the accident," Mrs. Swajian was taken to a hospital, "where blood samples were obtained and a blood alcohol content of 0.174 was measured." Ibid. In Rhode Island (where the accident took place), a blood alcohol level of 0.10% is "presumptive evidence of intoxication." Ibid.
Prior to trial, Swajian filed a motion to "exclude all reference to decedent's consumption of alcoholic beverages and her blood alcohol level." Id. at 34. The District Court judge granted this motion, holding that, given the "dramatic" extent of Mrs. Swajian's intoxication, this evidence was "unduly inflammatory and far outweighs its probative value." Ibid. The judge barred any "evidence of intoxication." Ibid.
The jury found GMC liable, and awarded Swajian $449,033 for the loss to Mrs. Swajian's estate and $551,000 for his loss of consortium. Id. at 33. Among other things, GMC appealed the District Court's decision to "exclude all evidence of Mrs. Swajian's intoxication." Ibid.
The Court of Appeals concluded that granting the motion to exclude this evidence constituted "clear error," reversing and remanding for a new trial. Id. at 35. The Court of Appeals explained why as follows:
*1231 Granting this motion denied the jury the opportunity to fairly judge this case. The district court erred in characterizing the intoxication as merely "corroborative evidence" of abnormal driving, since it is essential evidence from which the jury could infer the cause of the accident. The cause of the loss of control is the ultimate issue in the case, and, without this explanation, the jury had only Swajian's allegations of design defects to consider.
[Id. at 34.]
The trial judge made no specific finding of "unfair prejudice." It appears, from the trial judge's order, that evidence of intoxication would have been admissible if the decedent had consumed less alcohol, and thus decedent's estate profits from her misconduct only because it was so egregious. This cannot be the law. Furthermore, the trial court ignored the probative value of the evidence to GMC's case. Armed with this evidence, the jury could have concluded that driver error contributed significantly to, if not caused, decedent's accident. As it was, the jury was presented with the following factual scenario: the two month old vehicle was travelling down a straight, flat road in good weather when it swayed and went out of control for no apparent reason. The only explanation proffered was that there was a defect in one of the axles. Without the evidence of intoxication the jury was left with no reason for the loss of control other than Swajian's allegations.
[Ibid.]
Evidence of intoxication is, by definition, prejudicial because that is precisely the intended function of relevant and probative evidence. Indeed, that evidence could have prompted the jury to return a verdict for GMC. This hardly renders the evidence unduly inflammatory; it simply highlights its significance.
[Id. at 35.]
We are satisfied that the intoxication of the decedent was properly admitted on the issue of comparative negligence which was pled as a defense in this case.
Affirmed.