766 A.2d 304 (2001)
337 N.J. Super. 35
Milton SALDANA, Plaintiff-Appellant, and
Maria Santiago Saldana, Plaintiff,
v.
MICHAEL WEINIG, INC., Defendant-Respondent, and
Michael Weinig GMBH & Co.; European DesignsEMI; Michael Black; Gallagher Basset Services, Inc.; Cindy Harkins; National Union Fire Insurance Co. of Pittsburgh; and John Does Nos. 1-100, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 2000.
Decided January 31, 2001.
*306 Brian E. Mahoney, argued the cause for appellant (Ginarte, O'Dwyer, Winograd & Laracuente, attorneys; Mr. Mahoney, of counsel and on the brief).
Paul A. Lisovicz, Morristown, argued the cause for respondent (McElroy, Deutsch & Mulvaney, attorneys; Robert J. McGuire, of counsel and on the brief).
Before Judges BAIME, CARCHMAN and LINTNER.
*305 The opinion of the court was delivered by LINTNER, J.A.D.
Plaintiff, Milton Saldana, suffered a partial amputation of his right thumb while attempting to remove a wood chip from a wood molding machine that he was operating for his employer. He brought a products liability action against the distributor of the machine, defendant Michael Weinig, Inc., asserting claims based upon defective design and failure to warn. Plaintiff abandoned his claim of failure to warn and tried the issue of liability before a jury on the theory that the guard, provided at the point of operation, was defectively designed. The jury found that the wood molding machine was not defective. Plaintiff appeals from the adverse verdict and denial of his alternative motion for new trial or judgment NOV. We are convinced that the judge's trial ruling, based upon defense counsel's unfulfilled representations, permitting the introduction into evidence of a photograph of the machine taken by defendant's investigator, resulted in a clear capacity to produce an unjust result.[1] We therefore reverse and remand for new trial.
On September 27, 1996, plaintiff and his wife, Maria Santiago Saldana,[2] filed a personal injury complaint against unidentified "John Doe" manufacturers, distributors, and lessors of a wood molding machine. Also named as defendants, for the purposes of obtaining discovery, were European Designs, plaintiff's employer, (European); Michael Black, owner of European; European's workers' compensation insurance carrier, National Union Fire Insurance Co. of Pittsburgh (National); Gallagher *307 Bassett Services, Inc. (Gallagher), an independent adjuster retained by National; and Gallagher's agent, Cindy Harkins.
Ultimately, plaintiff dismissed his action against European, Black, National, Gallagher, and Harkins, after receiving requested discovery material. On January 3, 1997, plaintiff filed an amended complaint naming distributor Michael Weinig, Inc., and the manufacturer, Michael Weinig GmbH & Co. as defendants. After a three-day trial on the issue of liability, the jury returned a verdict finding that the machine had not been defectively designed. The trial judge entered an order confirming the jury's verdict and dismissing the amended complaint in its entirety. Following argument, the trial judge issued an oral decision denying plaintiff's motions for new trial and judgment NOV and, concomitantly, entered a conforming order. On August 2, 1999, as the result of numerous problems associated with the processing of the audiotapes used at trial, the judge entered a "consent order settling record," which included a "stipulated synopsis" of key occurrences at trial.
We briefly state the facts relevant to this appeal. The wood molding machine, Model U17A, was sold by defendant to Camden Mill Works of Pennsauken in March 1984. It thereafter was purchased by European. The machine is a six-spindle, wood-molder "utilized to shape and plane multiple faces of wooden stock used primarily in the manufacture of moldings and furniture." It is about sixteen feet long with an integral tabletop surface that is about thirty-three inches above floor level. Unfinished wood of variable lengths is inserted into one end of the machine and conveyed by automatic feed rollers past six spindles consisting of multi blade cutters, which plane and cut the wood to a predetermined design. The finished piece is expelled from the opposite end. The spindles rotate at 6,000 revolutions per minute. The rotational speed of the cutter blades is so fast that they cannot be seen distinctly and appear as a gray-colored "blur." When a cutter is operating, it produces a "very loud wind noise," and when a cutter is actually molding a piece of wood, it produces a "tremendous loud sound."
The first spindle cutter, which was the cause of plaintiff's injury, is known as a "referencing spindle." It is located at the beginning of the run within the table top nearest the operator. Because the cutter blades face upward, the first spindle cutter acts to plane the bottom of the wood piece so that it rests firmly and squarely on the table plate thus insuring that the finished piece is made "accurately." The point of operation where plaintiff was injured is guarded in part by a "pressure beam," a rectangular box housing the feed rollers, some distance above the point of operation that covers the adjacent table top and adjusts to a maximum height of four inches, depending on the thickness of the unfinished wood piece to be processed. There is also an adjustable wooden guide that partially guards the spindle cutter involved in plaintiff's injury.
Normally, the machine is set up to make molding approximately one and seven-eighth of an inch wide by three-quarters of an inch to one inch thick. At its normal setting, the bottom edge of the side of the rectangular guard is open, a distance of approximately two and one-half inches above the table top surface exposing the cutter blades. Plaintiff, who had been employed by European for two and one-half months, had prior experience working with wood molding machines with another employer over a three-year period of time. He understood that he was to keep his hands away from the rotating blades of the first spindle cutter. On the day of the accident, plaintiff had operated the machine for about two hours, during which time there were "numerous jams of wood stock." With Michael Black standing nearby, plaintiff raised the pressure beam to its maximum height, which revealed that a small sliver of wood had become lodged in the area of the fence near the first spindle cutter causing the machine to *308 "jam" and thereby mar the finished wood product. Bending down in order to see the wood chip, plaintiff reached underneath the guard through the side opening, a distance of approximately four inches. Although aware that the machine was running, plaintiff indicated that he momentarily forgot that the blades were in the vicinity of the wood chip when he reached under the guard.
The cutter blades tore away his thumbnail and some of the tissue below it, resulting in the "partial amputation of his right thumb" above the knuckle joint. Plaintiff underwent surgery and rehabilitation and was medically cleared to return to work without restriction on May 1, 1996.
Prior to picking a jury, plaintiff announced that he was voluntarily abandoning his warnings claim. Simultaneously, plaintiff moved to crop the photographs of the machine, produced by defendant, to remove the warning sticker appearing in the photographs near the point of operation where plaintiff was injured. Counsel explained that about five months after the accident, he had contacted European's owner, Black, and arranged for an inspection of the machine to be held on April 17, 1996. The day before the scheduled inspection, Black notified plaintiff's counsel that the inspection had to be postponed and rescheduled. Nine days later, on April 25, 1996, Black permitted defendant's representative, Danny Boggs, to inspect and photograph the machine. The photographs taken by Boggs depicted a single, relatively large and graphic warning sticker directly above the point on the machine where plaintiff was injured, showing blades, a hand, and a partially amputated finger. Counsel went on to explain that months later, as the result of litigation to compel Black to permit an inspection, he and plaintiff's expert were permitted to examine the machine, which they found to be "plastered" with numerous additional warnings not shown on Boggs's photographs.
Counsel advised the judge that the circumstances raised in his mind a suspicion that the single sticker that was depicted in Boggs's photograph "was not really there when my client suffered his injury." Counsel pointed out that, although plaintiff testified at depositions that there was some type of written warning on the machine, he could not identify the warning depicted in Boggs's photographs as the warning present at the time of his injury.
In response, defense counsel advised the court that defendant had developed the warning stickers in the early 1990s. He indicated that the warnings had been sent to Camden Mill Works in 1991. He related that defendant sent a complete package of warnings to European approximately one year before plaintiff's accident when it subsequently learned that European was the owner of the machine. Defense counsel represented to the judge that Black would testify that the individual warning sticker depicted in Boggs's photograph was "in fact present on the guard at the time of the accident." In further support of its position that the photograph should not be cropped, defendant argued that the warning was relevant to the risk utility analysis as it relates to the issue of defective design. Defendant also maintained that the existence of the warning was relevant to the issue of proximate cause, in view of plaintiff's testimony that he momentarily forgot when he reached under the guard to clear the wood chip from the area of the blades.
The trial judge denied plaintiff's application to crop the photographs. Plaintiff's counsel then advised the judge that as a result of the ruling, he would argue his "fall back plan B" position that the existence of the warning at the location depicted in the photographs "shows the foreseeability of machine operators side access at the point of operation." With the exception of the warning sticker shown in the photograph, plaintiff identified one of Boggs's photographs as depicting the machine at the time of his injury and it was *309 subsequently admitted into evidence. Defendant never produced Black to testify that the warning sticker was, in fact, on the machine at the time of the accident.
Defendant's Vice-president of Technical Services, Lance Thrall, testified that the open-sided format around the first spindle cutter was the industry custom in 1984. According to Thrall, it was necessary to have open-sided access to the first spindle cutter so that the machine operator is able to see the cutter head during the initial set-up for processing a run of unfinished wood pieces. Unlike the first spindle cutter, the five other downstream spindle cutters are completely enclosed by metal guarding when the machine is being operated. Thrall testified that, if a wood chip or splinter is adversely affecting the machine's production, there are two modes of remediation. First, without stopping the machine and without placing oneself in danger, the operator can activate a remote lubrication pump that releases a "wax material" in an effort to solve the problem. If that action fails to correct the problem, then it is necessary to stop the machine using the red "E stop" button to remove the errant wood chip.
Thrall related that the machine did not have any warnings when it was produced in 1984. In August 1991, defendant produced a set of safety decals, which it sent to known owners of its Model U17A wood molding machines. One of the safety decals was specifically intended to be applied to the area near the first spindle cutter because defendant recognized the area as a "danger point." Plaintiff's employer, European, was sent a set of safety decals sometime before plaintiff's accident.
Each party presented expert testimony. Plaintiff's expert, Thomas J. Cocchiola, was of the opinion that the excessive height of the opening formed along the side of the guard represented a defective design because it failed to minimize the possibility that a worker would accidently come in contact with the rotating cutting head. He felt that the manufacturer should have incorporated an adjustable guard that would minimize or prevent access to its rotating cutter heads. During Cocchiola's testimony several objections were sustained that precluded testimony concerning the use of either a hinged guard or one made of plexiglass, which would afford visibility of the cutter blade. Plaintiff was also precluded from having his expert testify about the defendant's subsequently designed Profimat Model 22N wood molding machine, which was in production at the time of plaintiff's injury and incorporated guarding that fully enclosed the first rotating cutting head.
By contrast, defendant's expert, Peter J. Schwalje, found that the area around the cutter head was suitably and adequately safeguarded, the machine was free of defect or deficiency in its design, and was equipped with adequate controls to allow for safe operation and maintenance. The jury found that the machine was not defective in its design and, therefore, never decided the issue of proximate cause.
Plaintiff contends that the admission of the photograph of the machine depicting the existence of the warning sticker constituted reversible error. Defendant argues that the jury had no instructions on warnings and, therefore, the existence of the warning sticker had no impact on the jury's determination that the wood molding machine was not defectively designed. We first must determine the propriety of admitting the photograph of the machine containing the warning sticker.
Generally, to justify admissibility of a photograph, it must accurately represent the conditions existing at the time of the happening of the incident in question. N.J.R.E. 901; Garafola v. Rosecliff Realty Co., 24 N.J.Super. 28, 42, 93 A.2d 608 (App.Div.1952). The authentication of a photograph requires verification by a qualified individual, one who has made personal observations, thereby establishing that the conditions reproduced existed at the time of the accident. Ibid. In the alternative, *310 the witness providing the authentication may testify that the scene, which is depicted, has not changed since the time of the incident in question. State v. Wilson, 135 N.J. 4, 15, 637 A.2d 1237 (1994).
It was not disputed that, with the exception of the warning sticker, the photograph accurately depicted the molding machine used by plaintiff. Presumably, the trial judge denied plaintiff's request to crop the photograph to allow its use as depicting the point of operation based upon representations by the defense that it would call Michael Black to verify that the warning sticker was on the machine at the time of the incident. Under the circumstances, the photograph should have been marked for identification subject to proper authentication that the warning sticker was present at the time of the accident. N.J.R.E. 901. Absent such testimony, the photograph should have been cropped thereby eliminating the warning sticker and introduced into evidence on a limited basis to show the point of operation and the guard as originally advocated by plaintiff. N.J.R.E. 105; see Spedick v. Murphy, 266 N.J.Super. 573, 590, 630 A.2d 355 (App.Div.) certif. denied, 134 N.J. 567, 636 A.2d 524 (1993).
Defendant contends that its failure to call plaintiff's employer was not dispositive because plaintiff effectively waived his objection by admitting the photograph, after the judge sustained defendant's objection to have the photograph cropped. A party who objects to the admission of evidence is bound by an adverse ruling for the remainder of the trial. The objecting party is entitled to minimize the effect of the ruling by taking a contrary position without waiving, for the purposes of appeal, the prejudicial effect of the introduction of the entire subject matter over which the initial objection was made. Karmazin v. Pennsylvania Railroad Co., 82 N.J.Super. 123, 130, 196 A.2d 803 (App. Div.1964). Here, plaintiff clearly advanced his position that the photograph should be admitted without depicting the warning sticker. His subsequent admission of the uncropped photograph, based upon the adverse ruling of the trial judge, did not represent a waiver of his initial objection.
Defendant's argument that plaintiff should be precluded from claiming that the admission of the photograph was error because he thwarted defendant's attempts to authenticate the photograph by the testimony of Thrall is equally misplaced. Plaintiff's objection was well taken. It was consistent with his original position questioning the presence of the warning sticker at the time of the accident. Furthermore, no foundation was laid by defendant that Thrall possessed personal knowledge that European had in fact, at the time of the accident, applied the disputed warning sticker to the machine. N.J.R.E. 602, 901; Garafola, supra, 24 N.J.Super. at 42, 93 A.2d 608; Wilson, supra, 135 N.J. at 18-19, 637 A.2d 1237.
Defendant also argues that admission of the photograph was harmless and had no impact on the jury's determination that the wood molding machine was not defectively designed, because the jury received no instructions on warnings. We are hampered by the absence of a record of the trial judge's jury instructions and counsel's closing arguments. Counsel have stipulated that no mention was made by the judge about warnings in his instructions to the jury. They have also advised that the model jury instruction used by the trial judge included risk utility factors one through five. We, therefore, must analyze the law to determine what, if any, impact the pictured warning had upon the jury given the lack of any instruction on warnings by the court.
The determination of whether a product is defectively designed centers on the condition of the product at the time it left the hands of the manufacturer. Grier v. Cochran Western Corp., 308 N.J.Super. 308, 324-325, 705 A.2d 1262 (App.Div. 1998). The question to be decided, after imputing knowledge of the defect and its *311 danger to the manufacturer, is whether the manufacturer acted in a reasonably prudent manner in marketing the product or providing the warnings given. Fabian v. Minster Machine Co. Inc., 258 N.J.Super. 261, 609 A.2d 487 (App.Div.) certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992). Accordingly, the conduct of the injured employee-plaintiff occurring subsequent to the time the product left the manufacturer is irrelevant to the determination of design defect. Grier, supra, 308 N.J.Super. at 324-325, 705 A.2d 1262. The manufacturer can use neither the obviousness of the product's danger nor the plaintiff's conduct as a shield to avoid liability for an otherwise defective product. Id. at 325, 705 A.2d 1262.
In Green v. General Motors, 310 N.J.Super. 507, 517, 709 A.2d 205 (App.Div.) certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998), we observed that the determination as to whether a defect in design existed, requires the jury to decide "the risks and alternatives that should have been known to a reasonable manufacturer, and then assess whether the manufacturer discharged its duty to provide a `reasonably fit, suitable and safe'" product. Although the jury employs a risk-utility analysis utilizing those factors that are relevant to a particular case, the issue upon which most claims will turn is proof by the plaintiff of a "reasonable alternative design, the commission of which renders the product not reasonably safe." Id. at 518, 709 A.2d 205. Except in the limited circumstances proscribed by our products liability statute, the existence of a warning is generally not relevant to the question of design defect. N.J.S.A. 2A:58C-3.
Here, the warning, improperly before the jury, loomed bigger than life, especially when viewed in the context of the prevailing issue which was limited to defective design. We fail to see how any reasonable person could view the photograph of the area of the guard and not focus attention on the pictorial warning. Although extraneous to the issue at hand, it nevertheless permitted the jury, absent limiting instruction, to speculate as to its applicability, suggesting that its presence might be viewed as ameliorating the alleged defect concerning the design of the guard. Had the jury been presented with a cropped photograph of the machine thus eliminating the disputed warning, there would have been no opportunity for it to consider either its existence or impact on the safety of the questioned design. We conclude that the inclusion of the warning in the photograph, without proper authentication and limiting instruction, was error and its introduction into evidence had the clear capacity to produce an unjust result.
Because we reverse and remand for new trial, we caution that a properly authenticated warning, while unavailable as a means of avoiding liability from the consequences of an otherwise defective product, may nevertheless be relevant to the issue of proximate cause. Grier, supra, 308 N.J.Super. at 324 325, 705 A.2d 1262; Vallillo v. Muskin Corp., 212 N.J.Super. 155, 159 160, 514 A.2d 528 (App.Div.1986). A jury must be instructed carefully in strict liability cases, as it is essential to tailor the facts to the law to assist the jury in its fact-finding responsibility. Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210, 485 A.2d 305 (1984). The need for an "understandable and clear exposition of the issues," covering all essential matters, applies to "proximate cause and its place in the liability scheme." Ibid.
We make the following additional observations concerning plaintiff's remaining contentions. We are satisfied from our review of the record, including the expert report submitted by Cocchiola, that the trial judge's decision restricting plaintiff from introducing evidence concerning the design of defendant's subsequent model, the Profimat 22N, did not represent a manifest denial of justice. Plaintiff's expert report did not address either the feasibility of: (1) producing the design employed *312 by the Profimat 22N at the time Model U17A was initially developed or (2) retrofitting it at a later date after the Profimat 22N was in production. The trial judge used appropriate discretion in precluding plaintiff's expert from presenting his opinions on the subject of the Profimat 22N, which were not covered in his report. Ratner v. General Motors Corp., 241 N.J.Super. 197, 202, 574 A.2d 541 (App. Div.1990).
We are not convinced, however, that it was proper for the trial judge to preclude plaintiff's expert from testifying concerning the use of a hinged guard or one employing a see-through window. Cocchiola's deposition was never taken by defendant and his report contained, at least, some passing reference to use of adjustable guarding. On retrial, these deviations from Cocchiola's report should be examined in further detail and the trial judge should determine whether they are sufficiently minimal so as not to qualify as a design to mislead or create significant surprise or undue prejudice. Congiusti v. Ingersoll-Rand Co., Inc., 306 N.J.Super. 126, 703 A.2d 340 (App.Div.1997). Lastly, we consider plaintiff's contention that the trial judge erred in his response to the jury's inquiry regarding the possible existence of a separate pending lawsuit against plaintiff's employer. During jury deliberations, the jurors asked "whether there was a pending lawsuit against European Designs, plaintiff's employer." The judge instructed the jury that:
Whether or not there is another lawsuit pending against European Designs is irrelevant to the matters before you. You are to concern yourselves solely with the questions addressed to you and in accordance with the law I have previously explained.
The jury then retired and seven minutes later returned its verdict. Plaintiff's contention that the judge should have given the jury more information as we instructed in Joy v. Barget, 215 N.J.Super. 268, 521 A.2d 906 (App.Div.1987), lacks merit. Unlike the facts in Joy, here there was neither an unwarranted interjection of workers' compensation into the case that required further curative instruction, nor any specific prejudice that needed to be confronted. The trial judge's instructions were appropriate.
Reversed and remanded for new trial.
NOTES
[1] Defendant is represented in this appeal by different counsel.
[2] Maria subsequently separated from Milton and her per quod claim was abandoned.