**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1786-15T2

DAVID FISHBAIN, individually
and as executor ad prosequendum
of the ESTATE OF LINDA FISHBAIN,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

COLGATE-PALMOLIVE COMPANY;
THE SCOTTS COMPANY, LLC;
UNION CARBIDE CORPORATION;
UNIVERSAL RAZOR INDUSTRIES,
individually and as successor-in-interest
to and d/b/a The Shulton Group and/or
Shulton, Inc.; BRENNTAG NORTH
AMERICA, as a successor-in-interest to
Mineral Pigment Solutions, Inc., as a
successor-in-interest to Whittaker, Clark
& Daniels, Inc.; BRENNTAG
SPECIALTIES, INC. f/k/a Mineral
Pigment Solutions, Inc., as a
successor-in-interest to Whittaker, Clark
& Daniels, Inc.,

      Defendants,

and

SHULTON, INC., individually and as successor to The Shulton Group and/or Shulton, Inc.; THE PROCTOR & GAMBLE COMPANY, as successor-in-interest to the Shulton Group and/or Shulton Inc.; WHITTAKER, CLARK & DANIELS, INC.; and WYETH HOLDINGS CORPORATION, f/k/a American Cyanamid Company, individually and as successor-in-interest to The Shulton Group and/or Shulton, Inc.,

        Defendants-Respondents/
        Cross-Appellants.

_____

Argued October 3, 2018 – Decided August 29, 2019

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5633-13.

Amber R. Long argued the cause for appellant/cross-respondent (Szaferman, Lakind, Blumstein & Blader, PC, and Levy Konigsberg, LLP, attorneys; Robert E. Lytle, Jeffrey P. Blumstein, and Moshe Maimon, on the briefs).

Alan I. Dunst argued the cause for respondent/cross-appellant Whittaker, Clark & Daniels, Inc. (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Richard J. Mirra, of counsel; Richard J. Mirra, Anita S. Cohen, Aime C. Kalac, and Kathryn F. Suchman, on the briefs).

A-1786-15T2

Henry L. Miller, III, argued the cause for respondents/cross-appellants Shulton, Inc., The Proctor & Gamble Company and Wyeth Holdings Corporation (Goldberg Segalla LLP, and John D. Cosmich (Cosmich Simmons & Brown, PLLC) of the Mississippi bar, admitted pro hac vice, attorneys; Henry L. Miller, III, Anita Hotchkiss, John D. Cosmich, and LaKeysha Greer Isaac (Cosmich Simmons & Brown, PLLC) of the Mississippi bar, admitted pro hac vice, on the briefs).

PER CURIAM

Plaintiff David Fishbain, individually and as executor and executor ad prosequendum of the Estate of Linda Fishbain, appeals from a final judgment entered following a jury verdict rendered in favor of defendants Shulton, Inc. (Shulton), The Proctor & Gamble Company, Wyeth Holdings Corporation (Wyeth),[1] and Whittaker, Clark and Daniels, Inc. (WCD). More particularly, plaintiff challenges an order granting defendants' motion to exclude evidence concerning vintage samples of the products plaintiff alleges caused personal injuries to, and the death of, Linda Fishbain, the court's allowance of alleged hearsay testimony from a WCD representative and the court's decision permitting defense counsel to reference and show the jury a 1986 letter from the

---

[1] Plaintiff filed suit against Shulton individually and as successor to Shulton, Inc., which is also variously referred to as The Shulton Group, but the record reflects that Shulton's correct name is Shulton, Inc. Plaintiff filed suit against The Proctor and Gamble Company and Wyeth as successors-in-interest to Shulton, Inc.

Food and Drug Administration (FDA) during opening arguments. Defendants cross-appeal, arguing that if plaintiff's appeal is successful and the matter is remanded for trial, there are numerous errors in the court's pretrial and trial rulings that should be reversed. Based on our review of the record in light of the applicable legal principles, we affirm the jury verdict and the court's final judgment and dismiss defendants' cross-appeals as moot.[2]

I.

On April 3, 2013, Linda Fishbain was diagnosed with epithelioid malignant mesothelioma. She and her husband, plaintiff David Fishbain,[3] filed a complaint asserting strict liability, failure to warn, product liability claims, and a loss of consortium claim against defendants Shulton, The Proctor & Gamble Company, WCD, Wyeth and other defendants alleging Linda Fishbain's exposure to asbestos in various consumer talc products—to which she was

---

[2] Shulton and WCD cross-appeal from various orders of the trial court. It is unnecessary to address the cross-appeals because we affirm the final judgment dismissing plaintiff's complaint.

[3] We recognize Linda Fishbain was a plaintiff when the complaint was filed, that she passed away during the trial and that David Fishbain prosecutes the appeal on his own behalf and as executor ad prosequendum of Linda Fishbain's estate. Our reference to David Fishbain as the singular plaintiff is for purposes of clarity and consistency only and is not intended as any disrespect to Linda Fishbain.

exposed from 1964, when she was nine years old, through the late 1970s—caused her to develop mesothelioma.[4]  In general terms, the complaint alleged WCD supplied asbestos-contaminated talc to Shulton, Shulton incorporated the talc into its consumer talc products, and Linda Fishbain used and was exposed to the asbestos-contaminated products, which caused the mesothelioma that resulted in her death.

The Rule 104 Hearing:  The Alleged Vintage Samples

Prior to trial, defendants moved to preclude plaintiff's liability expert, Sean Fitzgerald, from testifying.  Defendants challenged the scientific reliability of the testing methodology used by Fitzgerald to arrive at his opinion that the various Shulton talc products Linda Fishbain either used or was exposed contained asbestos.  This included the purported vintage Shulton samples, as well as ore samples from the source mines of the talc used in Shulton's products.  Defendants also argued that even if the court determined Fitzgerald's testing methodology was scientifically reliable, plaintiff should be barred from introducing at trial the purported vintage samples of talc products—Cashmere Bouquet, Desert Flower and Old Spice, which had been purchased in 2012 on

---

[4]  The complaint and first amended complaint included claims against other defendants that are not pertinent to the disposition of this appeal.

the website eBay—and Fitzgerald's testimony concerning his testing of the samples, because they were not sufficiently authenticated under N.J.R.E. 901.

Shulton manufactured the Desert Flower and Old Spice products.[5] The Colgate Palmolive Company (Colgate Palmolive) manufactured Cashmere Bouquet.[6] Plaintiff claimed the vintage Shulton samples, which were purportedly produced in the 1960s and 1970s during the time Linda Fishbain alleged she either used or was exposed to them, were properly authenticated. Plaintiff contended that, consequently, the samples should be admitted at trial and Fitzgerald should be permitted to testify about the results of his testing of the products for asbestos.

Plaintiff offered Fitzgerald as an expert in geology, microscopy and asbestos analysis. The court conducted a N.J.R.E. 104(a) hearing and issued a detailed written statement of reasons rejecting defendants' claim that Fitzgerald's opinions were not based on a scientific methodology of the type reasonably relied on by experts in the fields of Fitzgerald's expertise. However,

---

[5] The Old Spice samples consisted of Old Spice Talcum for Men and Old Spice Traveler Set products.

[6] We do not address Fitzgerald's testing of the purported samples of Cashmere Bouquet because plaintiff settled his claims against Colgate Palmolive during trial.

pertinent to this appeal, the court barred the admission of three purported vintage samples of Shulton products: Old Spice Talcum for Men, Old Spice Traveler Set and Desert Flower. The court found these samples were not properly authenticated under N.J.R.E. 901 because plaintiff failed to present competent evidence establishing an unbroken chain of custody of the samples during the over-forty-year period between their alleged production in the 1960s and 1970s and their 2012 purchase on eBay.

The court explained that plaintiff attempted to authenticate the three purported vintage samples by relying on the affidavit of Leah Kagan, an attorney with plaintiff's counsel's law firm, who in turn relied in part on the affidavit of Eileen Bouvier, a paralegal at Early, Lucarelli, Sweeney & Melsenkothen. Bouvier's affidavit in part incorporated three prior affidavits she filed in another matter. In her affidavit, Bouvier explained that she purchased the three samples on eBay in 2012 from three different sellers in connection with another matter.[7]

The court noted that Bouvier said she purchased the Old Spice Traveler Set sample from an individual in Texas known to Bouvier only as "baylorfan82" who provided the following information about the purported sample in an

---

[7] The other matter was identified as Kaenzig v. Charles B. Chrystal Co., No. A-2512-13 (App. Div. Mar. 27, 2015).

electronic transmission: "The only thing that I can tell you is that I found it when cleaning out my father's house. I think he bought it at a Globe store, which isn't in business anymore." Kagan further attested to conducting research that showed "Globe Discount City" was in business from 1960 through 1977 and did not sell used products. The court noted that Kagan also asserted that a picture of an Old Spice Traveler Set in a Shulton catalog from the period "1960s-1973" "matches" the purported sample provided by baylorfan82.

The court also addressed the purported vintage sample of Old Spice Talcum for Men, noting that Bouvier received an electronic transmission from an individual, known to Bouvier only as "ladunkerly@[]," who sold the product to her. The transmission stated: "I was helping my mom do some downsizing and it was in my dad's linen closet. I am assuming that one of us kids gave it to him for Christmas or Father['s] Day or something." The court further noted that Bouvier did not provide any information concerning her purchase of the Desert Flower sample.

The court explained that Bouvier detailed her examination of each of the samples when she received them, indicated that each was intact and had not been tampered with following receipt, and further described what was done with each sample after she received them. Kagan's affidavit included as an attachment the

certification of Steven Compton, PhD, a research scientist who participated in an analysis of the samples, who stated the samples were in their original packaging and that the Desert Flower sample was in a container with parchment paper attached that he had to tear open to access the talcum powder. The court noted the evidence submitted from three experts that tampering with the talcum powder in the samples to achieve the consistent test results obtained by Fitzgerald would be impossible.

The court reasoned that plaintiff presented only two expert witnesses at the N.J.R.E. 104 hearing, Fitzgerald and Dr. James Weber, and that neither of these witnesses provided competent evidence supporting the authenticity of the samples during the over-forty-year period following Linda Fishbain's alleged use and exposure to similar products and Bouvier's receipt of them.[8] The court noted Weber's testimony that "he had no way of knowing" whether the product that left the Shulton production facility over forty years earlier "was the same product he tested" in the samples obtained by Bouvier. The court rejected plaintiff's reliance on Kagan's and Bouvier's representations concerning the samples because they did not "have any personal knowledge" and their

---

[8] The court did not base its finding on the chain of custody on what occurred following Bouvier's receipt of the samples.

representations concerning the samples "merely pass[ed] along hearsay upon hearsay." The court concluded that plaintiff failed to present sufficient evidence of an unbroken chain of custody authenticating the samples and barred their admission at trial and Fitzgerald's testimony concerning his testing of them.

The court also barred the evidence and testimony under N.J.R.E. 403, finding that plaintiff offered no reliable evidence concerning the identification of the sellers of the samples and that defendants would therefore be deprived of their right to cross-examine the sellers at trial. Stated differently, the prejudicial effect of these questionable samples far outweighed their minimal probative value. As the court explained: "At a minimum, the testimony of the respective sellers of the [samples] would be required" at trial. Plaintiff, however, never identified the sellers of the samples, beyond the two email addresses included in the electronic transmissions related to the Old Spice Traveler Set and Old Spice Talcum for Men samples, and never called the sellers as witnesses at trial.

The court entered an order barring admission of the three purported Shulton vintage samples at trial and testimony concerning Fitzgerald's testing of them. The matter then proceeded to trial.

<u>The Trial</u>

The trial occurred over nineteen days. The evidence showed that Linda Fishbain was born in 1955 in Somerset County, where she lived in a number of different locations with her family until they moved to Florida in 1969. She lived with her parents until 1980, when she married plaintiff.

While living in New Jersey, Linda Fishbain and her family visited their relatives about twelve times per year in nearby Manville, where a manufacturing plant owned by Johns Manville produced asbestos-containing products. Linda Fishbain testified that three of her childhood friends died of mesothelioma, and her mother testified that two of her close friends from the grammar school they attended in Manville died of the disease.[9]

In the different homes in which Linda Fishbain lived with her family prior to her marriage in 1980, she shared a bathroom either with her entire family or her siblings, a sister and two brothers. At age nine or ten, in the mid-1960s, Linda Fishbain began using talcum powder on a daily basis following showers or baths. She first used Cashmere Bouquet, began using Desert Flower when she was eleven or twelve, and started using Friendship Garden between ages

---

[9] Linda Fishbain's videotaped discovery and bene esse depositions were played for the jury.

eleven and thirteen.  Her father used Old Spice talcum powder after his showers.

Her sister, Isabele D'Achille, also used talcum powder every day, including at different times Cashmere Bouquet, Desert Flower and Friendship Garden.  Linda Fishbain said the bathroom window was usually closed when she and her sister applied the talcum powder and that the air in the bathroom would become very dusty.  She also was present in the bathroom when her mother applied talcum powder.

Linda Fishbain denied using Old Spice talcum powder or being present when her father used it, but said she helped clean the family's bathrooms each week and recalled the floors were full of talcum powder, which was difficult to remove.  She took the bath rugs outside to shake them, producing "[a] lot of dust."  She did not keep any of the talcum powder products that she had used while in her family's homes and none were ever tested for asbestos contamination.

Linda Fishbain told her doctors about her potential exposure to asbestos from growing up near, and visiting her relatives by, the Manville asbestos plant, but did not mention her exposure to talcum powder.  She first learned that cosmetic talcum powder might contain asbestos a few months prior to her deposition.

A-1786-15T2

Linda Fishbain was diagnosed with epithelioid malignant mesothelioma in April 2013. She thereafter underwent various treatments including chemotherapy, a pneumonectomy, radiation and a clinical vaccination trial for mesothelioma, and passed away on October 5, 2015, at age sixty.

Mesothelioma is a cancer of the mesothelial cells and is known as a "signal tumor" because of its strong association with asbestos, which is a naturally occurring mineral. There are six asbestos minerals that fall into two groups: chrysotile, a serpentine rock where the silicate forms into "tight little scroll[s]," which is the most common type of asbestos used in products; and five asbestiform varieties of amphiboles, including tremolite, anthophyllite, actinolite, crocidolite and amosite, which crystallize into long, thin fibers. Although amphiboles can be found adjacent to talc deposits, they are usually in a non-asbestiform habit. Asbestos fibers are microscopic and may remain airborne for hours or days. Inhalation of the fibers can cause mesothelioma.

Asbestos and talc can form in the same bands of rock. Talc is a sheet silicate, which stays "platey" or flat. Cosmetic talc is ninety-five percent pure talc with the remaining five percent consisting of associated minerals such as chlorite, quartz, and dolomite. The types of asbestos most likely to be found in talc are chrysotile, tremolite, and anthophyllite.

A-1786-15T2

WCD distributed products to various industries, including cosmetic talc to Shulton, which manufactured Old Spice, Friendship Garden, and Desert Flower talcum powder products.[10]  William Ward, Shulton's corporate representative, testified his review of Shulton archives revealed no reference to WCD or its testing of talc or any certification that the talc WCD sold to Shulton was asbestos-free.  Ward explained that there were different packaging formats for Friendship Garden and Desert Flower products sold by Shulton throughout the 1960s and 1970s, and that they changed periodically.

The jury was shown the video recording of the deposition of Wilfred Kaenzig and read an excerpt from his trial testimony in another case.[11]  Kaenzig began working for Shulton in August 1963.  He testified that in 1966 Shulton acquired a plant in Mays Landing, where it manufactured colognes and talcum powder items such as Old Spice, Desert Flower, and Friendship Garden. Kaenzig testified that during the time he worked at the Mays Landing plant, WCD supplied ninety-nine percent of the talc used by Shulton.  Kaenzig never

---

[10] In 1971, American Cyanamid acquired Shulton, which became a subsidiary. American Cyanamid was later sold to Wyeth, and in 1990, the Old Spice product line was sold to The Proctor & Gamble Company.

[11] Kaenzig v. Charles B. Chrystal Co., No. A-2512-13 (App. Div. Mar. 27, 2015).

saw any asbestos warning labels on the bags of raw talc WCD sent to Shulton. He did not know where WCD obtained the talc or who supplied Shulton with raw talc before 1966.

According to Kaenzig, in the late 1970s, Shulton received complaints about a white powder residue on some of its "pack-out items" and recalled a light dusting of white powder throughout the plant. In the late 1970s, Shulton moved its talc operation to Memphis, Tennessee: Kaenzig did not know the identities of the suppliers of talc to Shulton after that time. He never saw warnings about asbestos on Old Spice or Desert Flower products and said no one ever warned him of the health hazards associated with talc.

Theodore Hubbard testified as WCD's corporate representative in response to a notice in lieu of subpoena served by plaintiff and explained that WCD sold the following grades of cosmetic talc to Shulton: 141 from a mine in Alpine, Alabama; 2450 and 643 from the Hitchcock Mine in North Carolina; and 1615 from a mine in Val Chisone, Italy.

Hubbard, who began working at WCD in 1978, testified the company started testing for possible asbestos contamination in August 1971, when it learned of the FDA's interest in the possible presence of asbestos in talc. He explained that in an October 6, 1971 letter, the FDA stated it "generally agreed

that most talcum powders of major manufacturers [we]re relatively free of asbestos," but that it was "working on the details of a laboratory procedure for the analysis of asbestos in talcum powders."

Hubbard said WCD initially outsourced the testing of talc to other laboratories because it lacked the in-house capabilities, and the testing methodology used by those laboratories in 1971 was adopted in 1976 by the Cosmetic Toiletry and Fragrance Association (CTFA), a trade association for companies selling cosmetics, and later recommended by the FDA.

Hubbard said WCD began its testing program for talc because WCD had an obligation to ensure it did not supply cosmetic companies with defective products. Hubbard reviewed the results of hundreds of X-ray diffraction tests of WCD's talc and reported that probably four were positive for asbestos. He testified WCD never sold contaminated talc to Shulton or any other customer for use in cosmetic products. WCD received pre-shipment samples of cosmetic talc, and if the tests revealed asbestos, the shipments were canceled.

Hubbard stated that after testing began in 1971, WCD never warned Shulton about the potential danger of asbestos contamination in talc because it never found asbestos in any product sold to Shulton. He also explained that the FDA never required that a warning be placed on talcum powder products sold

16

to the public. He confirmed that in a 1986 letter the FDA denied a consumer's petition for a requirement that asbestos warning labels be placed on cosmetic talc products. He explained the letter noted the significant improvement in the quality of cosmetic talc in the late 1970s, and that even if asbestos was present, "the levels were so low that no health hazard existed."

Fitzgerald, who was qualified as plaintiff's expert in geology, microscopy, and asbestos analysis, testified that from 1955 to 1980, WCD's grades of talc 141, 1615, 643 and 2450, and Shulton's Desert Flower, Friendship Garden, and Old Spice talcum powder products were "regularly and consistently contaminated with asbestos." In forming his opinion, Fitzgerald relied on: (1) articles about asbestos and those grades of talc that WCD obtained from the three mines and were used in Shulton's products; (2) historical testing of talc from the three source mines; and (3) his own testing of raw talc ore samples.

According to Fitzgerald, the geology of the three source mines and the historical testing confirmed asbestos contamination in the grades of talc supplied by WCD for use in Shulton's Old Spice, Friendship Garden and Desert Flower talcum powder products. For example, in 1972, ES Laboratories tested talc for WCD and found chrysotile and anthophyllite. In 1973, tests performed for WCD on talc from the source mines in Alabama, North Carolina and Italy showed

chrysotile and tremolite. A 1977 test of grade 1615 talc from the Val Chisone mine in Italy detected tremolite. In 1982, at WCD's request, New York University conducted a test of grade 1615 talc from the Val Chisone mine and found it was two percent tremolite and 0.5 percent chrysotile.

Fitzgerald said that his tests of talc grades 141 from the Alabama mine and 1615 from the Italian mine also showed asbestos contamination. He tested the talc using the glove box method, defined by the Environmental Protection Agency (EPA) as a "sealed test chamber" for fiber generation and air sampling. Fitzgerald explained that, by "simulating the product use," the aerosolization of the raw talc confirmed the presence of asbestos inside the glove box and yielded results that were consistent with his review of the geology and historical tests.[12]

Fitzgerald confirmed the presence of asbestos using other methods such as diffraction and testified that the results of the follow-up tests revealed the presence of chrysotile and anthophyllite in both grades of the talc ore. He also tested rocks he collected from the mine in North Carolina, and detected the presence of "magnesium, silicon, calcium and iron consistent with the chemical formula for the amphibole tremolite." He opined that one hundred percent of

---

[12] The jury watched a video of the aerosolization of talc inside the glove box. The record does not include the video. The video, however, is not an issue on appeal.

the talc from the North Carolina mine was contaminated with asbestos, even though some tests failed to detect any contamination.

Fitzgerald conceded the FDA had approved only bulk testing of talc, and acknowledged that the EPA criticized the indirect method of breaking apart complex structures because it led to higher counts than the direct method. Fitzgerald further acknowledged that other historical studies did not detect tremolite or chrysotile in the source mines. In support of his opinions, Fitzgerald relied on the deposition testimony of Hubbard and Kaenzig that WCD provided Shulton with the raw talc from the three source mines for Shulton's use in its Old Spice, Desert Flower and Friendship Garden products. He did not know who supplied the raw talc to Shulton before 1966.

Dr. Jacqueline Moline, plaintiff's expert in occupational and environmental medicine, and asbestos and asbestos disease, testified the presence of asbestos in cosmetic talc has been confirmed and scientific communities generally agree there is no safe level of exposure. She explained that exposure to asbestos could cause mesothelioma, but recognized the vast majority of individuals who had occupational or environmental exposure to asbestos did not develop mesothelioma. According to Moline, a person could develop mesothelioma after exposure to a very low dose of asbestos, although a

longer exposure made it more likely.

Moline said Linda Fishbain breathed in asbestos fibers that escaped into the air in the confined space of the bathrooms shared with her family members and that asbestos fibers also could have gotten into the ducts and other parts of the house, causing continuous exposure. She noted that vacuuming or sweeping asbestos-covered floors could make the problem worse by bringing the asbestos back into the air. Moline did not know whether Linda Fishbain was significantly exposed to asbestos growing up near the Manville plant, explaining she had no idea about wind patterns or actual exposure. She also testified that asbestos could linger in the air for hours, "if not days," and that the typical latency period from exposure to development of the disease was "30, 40, 50" years. In Moline's opinion, Linda Fishbain's use of and exposure to Shulton's and WCD's talc products were substantial factors in causing her mesothelioma.

Moline had no personal knowledge that the Shulton products actually contained asbestos or whether WCD supplied Shulton with asbestos-contaminated talc. Based on the information provided to her, she assumed WCD supplied the talc to Shulton for its talcum powder products and that "the talcum powder products that [Linda Fishbain] was exposed to contained asbestos." She conceded that if either of those assumptions was incorrect, her conclusion that

Shulton and WCD caused the mesothelioma was invalid. When Moline prepared her expert report, she also offered the opinion that Linda Fishbain's exposure to Scotts' lawn care products and Colgate-Palmolive's Cashmere Bouquet talcum powder were substantial contributing factors causing her mesothelioma.

Mark Taragin, M.D., an internist with a master's degree in public health, testified as defendants' expert in the fields of epidemiology and the assessment of diseases from exposure to asbestos. He reviewed medical records, depositions and expert reports and concluded Linda Fishbain's use of cosmetic talcum powder was not a substantial contributing factor in causing her mesothelioma.

Taragin said there was no scientific literature or epidemiological study suggesting the use of or exposure to cosmetic talcum products caused mesothelioma, or studies indicating that miners and millers of cosmetic talc had an increased risk of developing the disease. Taragin viewed the lack of such studies as "critical information" because "the highest exposure is going to be people mining the substance." He referred to the 1986 FDA letter regarding the agency's views that: (1) "[t]he risk from a worse case estimate of exposure to asbestos from cosmetic talc will be less than the risk from environmental background levels of exposure to asbestos (non-occupational exposure over a

lifetime)"; and (2) no health hazard existed even when asbestos was present because the levels of asbestos were so low.

Taragin said thirty to fifty percent of women in the 1960s and 1970s used cosmetic talc and that, given that rate of use, he "wouldn't be at all surprised to find that a woman with mesothelioma or any cancer is going to have a frequent use of cosmetic talc because that's what was common." In Taragin's opinion, "[Linda] Fishbain's [fourteen] years in the vicinity of Johns Manville was a substantial contributing factor towards her mesothelioma." He also considered it significant that Linda Fishbain and her family visited an uncle who lived in Manville, noting that approximately twelve visits a year over fourteen years meant she spent the equivalent of four months in Manville.

Taragin explained that the documentation in Linda Fishbain's medical records "jive[d] with the literature as to why she would have mesothelioma." He referred to a 1997 article by Michael Berry of the Department of Health stating that women who lived in Somerset County, excluding Manville and Johns Manville employees, were at twice the risk of the comparison group of developing mesothelioma. Another study by the State of New Jersey identified cancer clusters from 1979 through 2001 and found that women who lived in the vicinity of Manville had a "15 fold" increase in their risk of developing

22

mesothelioma. Excluding people who lived in Manville and worked at the plant, Taragin determined that women who lived in the same areas as Linda Fishbain had an increased "12 fold risk." He said there was no known safe level of exposure to asbestos, but that some literature suggested exposure at an early age placed people more at risk for developing mesothelioma.

Taragin acknowledged on cross-examination that the FDA also recognized in its 1986 letter that asbestos inhalation over extended periods was hazardous to humans, that the agency was aware that "some cosmetic talc produced in the 1960's and 1970's did contain asbestiform minerals," and that the agency found significant improvement in the quality of cosmetic talc in the latter part of the 1970s. He acknowledged that he could not say with medical certainty that Linda Fishbain's fourteen years in the vicinity of the Johns Manville plant were a substantial contributing factor in causing her mesothelioma, but only a possibility.

Alan Segrave testified as defendants' expert in geology, mineralogy and microscopy "with an emphasis on the testing of asbestos-containing materials and talc, and the methodology associated with it." He managed the asbestos laboratory for Bureau Veritas North America, "the world leader in testing, inspection and certification in many different industries," and had thirty years

of experience in testing materials for asbestos.

Segrave opined that the test data from 1971 through 1994 and the results of Fitzgerald's testing of the talc ore samples did not support the conclusion that Linda Fishbain was exposed to asbestos-contaminated talc. Segrave believed the scientific literature was consistent with his opinion that the three mines that supplied talc to Shulton were not regularly and consistently contaminated with asbestos. He relied on published literature by geologists who had studied the deposits in those mines and on epidemiological studies on miners of talc who did not develop any increased incidence of disease. He also relied on 309 x-ray diffraction charts from WCD's testing of talc samples between 1971 and 1990, which included four reports of tremolite or anthophyllite, and the follow-up tests at his laboratory that found only one sample of grade 2450 from North Carolina was positive for tremolite and the other three samples were inconclusive. Instead, he mostly found the "accessory minerals" often associated with good quality talc such as chlorite, quartz, and dolomite.

Segrave tested one of the rocks collected by Fitzgerald at the North Carolina mine and determined it contained hornblende, a non-asbestiform amphibole mineral that contained aluminum. Segrave believed Fitzgerald's failure to detect aluminum led him to misidentify the mineral as tremolite and

noted that most amphiboles found were non-asbestiform and that it was very rare to find asbestiform amphiboles.

Segrave believed Fitzgerald's testing of the raw talc samples was flawed because a glove box was "not a recognized space to conduct a test for releasability." He also observed that Fitzgerald tested raw talc, not end products, explaining that end products such as talcum powder contained additives that could inhibit the release of asbestos. Even accepting Fitzgerald's methodology, Segrave said the results of the glove box testing fell below the Asbestos Hazard Emergency Response Act (AHERA), 15 U.S.C. §§ 2641 to 2656, clearance criteria and, in his opinion, Fitzgerald's glove box study was not "representative of a real world exposure or release of asbestos." Segrave concluded that Fitzgerald did not follow an acceptable protocol for a release study, that he used a hybrid of methods, that his results could not be reproduced, and that his testing failed to prove Linda Fishbain had been exposed to asbestos-contaminated talc.

The jury returned a verdict in defendants' favor finding plaintiff failed to prove: (1) either Shulton or WCD manufactured, sold or distributed a talc product that was not reasonably fit, suitable and safe for its intended and foreseeable use because it lacked a warning or because it was defectively designed; (2) Linda Fishbain used or was exposed to a talc product

A-1786-15T2

manufactured, sold or distributed by either defendant that was not reasonably fit, suitable and safe for its intended and foreseeable use because it lacked a warning; and (3) Linda Fishbain's use of or exposure to a talc product manufactured, sold or distributed by either defendant that was not reasonably fit, suitable and safe for its intended and foreseeable use because of a lack of warning or a defective design was a substantial factor in causing her mesothelioma.  The jury also determined defendants proved that at the time the talc products left their control, the danger that they could cause an asbestos-related disease was not known or knowable and that no practical and technically feasible alternative design existed that would have prevented Linda Fishbain's injuries without substantially impairing the reasonably anticipated or intended essential functions of the talc products.  Plaintiff appealed and, as noted, defendants cross-appealed.

## II.

Plaintiff first argues the court erred by barring admission of the three putative vintage Shulton samples and Fitzgerald's testimony concerning his testing of the samples.[13]  We are not persuaded.

---

[13] The court also barred Fitzgerald from testifying concerning his testing of "vintage Colgate Palmolive samples" consisting of three containers of various

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). Under this standard, the trial court's decision to allow evidence should not be overturned "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted." State v. Lykes, 192 N.J. 519, 534 (2007) (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)). If the trial court does not determine the admissibility of evidence under the correct legal standard, however, its decision is not afforded any deference and we review the issue de novo. State v. Reddish, 181 N.J. 553, 609 (2004).

Here, plaintiff challenges the court's determination barring admission of the three purported vintage Shulton samples and Fitzgerald's testimony about them because plaintiff failed to authenticate the samples. See N.J.R.E. 901. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the

---

sizes of purported "Colgate Cashmere Bouquet brand talcum powder," and two other talcum powder samples, Talc Ore Grade 1615 and Talc Ore Grade 141. Plaintiff does not challenge the court's order barring that testimony on appeal.

matter is what its proponent claims." Ibid. This rule of evidence "does not require absolute certainty or conclusive proof." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). "The proponent of the evidence is only required to make a prima facie showing of authenticity." Ibid. After such a showing is made, the evidence is admissible and the jury decides the ultimate question of authenticity. Ibid.

"A party introducing tangible evidence has the burden of laying a proper foundation for its admission." State v. Brunson, 132 N.J. 377, 393 (1993). Generally, that "foundation should include a showing of an uninterrupted chain of custody." State v. Mosner, 407 N.J. Super. 40, 62 (App. Div. 2009). Evidence will usually be admitted "if the court finds 'in reasonable probability that the evidence has not been changed in important respects or is in substantially the same condition as when'" the relevant event occurred. Ibid. (citations omitted). However, the "determination of whether the [proponent] sufficiently established the chain of custody is within the discretion of the trial court," ibid., and that "determination will not be overturned in the absence of a clearly mistaken exercise thereof," State v. Brown, 99 N.J. Super. 22, 27 (App. Div. 1968).

We discern no abuse of discretion in the court's decision barring admission of the three putative Shulton samples and Fitzgerald's testimony about them. An

abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" US Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467-68 (2012) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)).

The court's determination plaintiff failed to demonstrate an uninterrupted chain of custody of the samples is supported by the lack of any competent evidence establishing an uninterrupted chain of custody during the approximately forty-year period that elapsed from the samples' alleged production and distribution in the 1960s or 1970s until they were purchased by Bouvier in 2012. Plaintiff relies on email transmissions from two individuals describing assumptions and speculation concerning their respective families' possessions of the two Old Spice samples, but the individuals are unknown, their representations are not certified and cannot be verified, and defendants had no ability to challenge the representations. Moreover, even if the statements contained in the emails are true, they do not establish an uninterrupted chain of custody from the date of production of the samples until their delivery to Bouvier. Indeed, the emails contain only assumptions concerning the manner in which the samples were obtained and do not include any information or competent evidence concerning the condition of the samples when they came

into each family's possession, the length of the custody of each sample or the circumstances surrounding possession of the samples. In addition, other than Bouvier's statement that she purchased the Desert Flower sample on eBay, plaintiff's proffer concerning that sample is untethered to any evidence establishing its chain of custody prior to Bouvier's purchase.

The court did not abuse its discretion by barring admission of the samples and Fitzgerald's testimony. Plaintiff simply, but undeniably, failed to present any competent evidence establishing the uninterrupted chain of custody of the samples necessary to authenticate the samples under Rule 901 for the approximately forty-year period prior to Bouvier's purchases. See Brunson, 132 N.J. at 393; Brown, 99 N.J. Super. at 27.

We are also unpersuaded by plaintiff's claim the court abused its discretion by finding the samples were not properly authenticated because there was circumstantial evidence establishing authentication. Plaintiff argues the circumstances include Bouvier's observations of the condition of the packaging of the samples when she received them, a defense expert's testimony he had never seen evidence removed and replaced from a sample prior to testing, Fitzgerald and Weber's testimony at the N.J.R.E. 104 hearing that it would be difficult to replace the original talcum powder in the samples with powder

30

containing the concentrations of asbestos Fitzgerald reported finding, and Bouvier and Compton's representations that the Desert Flower sample included parchment paper that had to be torn to obtain access to the talcum powder.

In the first instance, one of the circumstances ignored by plaintiff, but properly recognized by the court, is the lack of any evidence concerning the chain of custody of the samples prior to Bouvier's purchase of them. In other words, in its assessment of whether plaintiff established a reasonable probability that the samples had not been changed in important respects or were in substantially the same condition as when they were first produced forty years earlier, see Mosner, 407 N.J. Super. at 62, the court properly recognized and relied on an important circumstance plaintiff ignores—the absence of any evidence showing the custody and condition of the samples during that forty-year period.

Moreover, the record lacks any evidence concerning Bouvier's or Compton's knowledge of the samples, including the Desert Flower sample, when they were first produced and, thus, their observation of parchment paper covering the powder did not establish the condition of the sample forty years earlier or at any time other than when it was in their possession, and could not establish whether the condition of the sample was the same or had changed over

that period. None of plaintiff's witnesses certified the talcum powder contained in the samples was the same talcum powder that was included forty years earlier when the sample containers were produced, and plaintiff's witness, Weber, testified "he had no way of knowing" whether the product that left the Shulton production facility over forty years earlier "was the same product" in the samples obtained by Bouvier that he examined. Fitzgerald similarly testified he did not know when the samples were produced, the names of the original purchasers, how many people had used the samples and where they had been stored before Bouvier purchased them on eBay.

Based on that record, we discern no abuse of discretion in the court's finding that plaintiff failed to sustain his burden under Rule 901 to demonstrate a reasonable probability that the samples were in the same condition as they were when they left Shulton's production facility forty years earlier. See Brunson, 132 N.J. at 393 (finding the party offering evidence has the burden to establish authentication under N.J.R.E. 901). The court's determination was amply supported by a record devoid of competent evidence demonstrating any of the circumstances surrounding the possession of the putative samples during the four decades prior to Bouvier's receipt of the samples from the anonymous

sellers.  We therefore affirm the court's order barring admission of the samples and Fitzgerald's testimony about them at trial.

III.

Plaintiff also challenges the admission of portions of Hubbard's testimony that he provided in his capacity as WCD's corporate representative.  Plaintiff claims Hubbard impermissibly offered testimony concerning information that predated the commencement of his employment with WCD in 1978, and that the testimony constituted inadmissible hearsay because it could only have been based on what he was told by others.

WCD, joined by Shulton, argues the challenged testimony was properly admitted because Hubbard was designated as WCD's corporate representative and produced in response to a notice in lieu of subpoena plaintiff issued pursuant to Rule 1:9-1.  WCD argues that because Rule 1:9-1 allows the subpoena of a corporate representative that is "deposable on its behalf, under [Rule] 4:14-2," the designated representative "is not limited to that witness's own personal knowledge" and therefore Hubbard could properly testify based on what he learned from others in the corporation.

Defendants' briefs are bereft of any citation to legal authority supporting the notion that the trial testimony of a corporate designee subpoenaed under

33

Rule 1:9-1 is exempt from the Rules of Evidence and the fundamental requirement that a witness testify solely to matters within his or her personal knowledge. N.J.R.E. 602. Rule 1:9-1's reference to Rule 4:14-2 does not expand the scope of a witness's permissible testimony at trial or create an exception to Rule 602's prohibition against testimony concerning "a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." N.J.R.E. 602. Rule 1:9-1 defines only the means for securing the presence at trial of a corporate designee deposable under Rule 4:14-2—by subpoena or a notice in lieu thereof. Rule 1:9-1 does not define the permissible scope of the designee's testimony once he or she takes the witness stand at trial.

Hubbard's testimony is also not otherwise exempt from the Rules of Evidence simply because he necessarily had to obtain information from others to testify as WCD's corporate representative. "A person who has no knowledge of a fact except what another has told him [or her]" may not testify as to the fact because of a lack of the personal knowledge required under Rule 602. Neno v. Clinton, 167 N.J. 573, 585 (2001) (alteration in original) (quoting McCormick on Evidence § 10 (5th ed. 1999)). That is because a statement founded on

hearsay lacks "'personal knowledge' of the substance of the statement, but only knowledge of the fact that the statement was made." Id. at 585-86.

Rule 4:14-2 allows a corporate representative to testify at a deposition "as to matters known or reasonably available to the organization," even if those matters are outside of the witness's personal knowledge. R. 4:14-2(c). But our Rules of Evidence permit the admission of hearsay testimony at trial only under limited circumstances, N.J.R.E. 801 to 808, and otherwise make no provision for the admission at trial of hearsay from a witness designated as a deposable corporate representative pursuant to Rule 4:14-2, other than, for example, by allowing admission of the hearsay testimony under exceptions to the hearsay rule, such as a statement by a party-opponent, N.J.R.E. 803(b), a statement against the corporation's interest, N.J.R.E. 803(c)(25),[14] or by a representative discussing admissible business records, N.J.S.A. 803(c)(6).[15] Indeed, Hubbard

---

[14] Under N.J.R.E. 803(b) and 803(c)(25), plaintiff may have been entitled to present testimony from Hubbard that would otherwise constitute hearsay, but WCD was not. See, e.g., Spencer v. Bristol-Myers Squibb Co., 156 N.J. 455, 460-64 (1998) (affirming the trial court's admission of statements of a corporate representative as statements of a party-opponent under Rule 803(b)).

[15] Rule 4:16-1(c) provides that any party may utilize the deposition testimony of a witness, "whether or not a party," against any other party that was present or represented at the taking of the deposition "if the court finds that the appearance of the witness cannot be obtained," but does not authorize the

testified throughout his direct examination by plaintiff's counsel, and during cross-examination by the various defense counsel, about the contents of what appear to be business records, many of which were created prior to the commencement of his employment. Plaintiff does not challenge the admission of that testimony on appeal.

Plaintiff challenges portions of Hubbard's testimony during WCD's counsel's cross-examination. We first consider whether the court erred by admitting the challenged testimony, and then determine whether the court's alleged errors were clearly capable of producing an unjust result. R. 2:10-2.

Although we accord deference to the court's evidentiary rulings absent an abuse of discretion, Nantambu, 221 N.J. at 402, we review a trial court's rulings de novo where the court does not determine the admissibility of evidence under the correct legal standard, Reddish, 181 N.J. at 609. We apply those standards here.

Plaintiff first asserts the court erred by allowing Hubbard to respond to a question about why WCD entered into a talc testing program in 1971. Hubbard

admission of hearsay testimony included in a deposition to which a proper objection is made. In any event, defendants did not seek admission of Hubbard's deposition testimony, plaintiff challenges only the admission of Hubbard's trial testimony, and Rule 4:16-1(c) is inapplicable here because Hubbard testified at trial.

began his response by stating that it was his understanding that the director of WCD's laboratory at the time "had seen an article." Plaintiff's counsel objected, and WCD's counsel, in obvious recognition of the hearsay nature of Hubbard's response, said he was not interested in what the WCD laboratory director had said, but instead wanted Hubbard to testify as to "what [he knew] as" WCD's corporate representative. Plaintiff's counsel again objected on hearsay grounds and, following a sidebar discussion, the court sustained the objection and said, "Let's develop the background."

In response to WCD's counsel's questions, Hubbard explained that he obtained his knowledge of the reasons WCD began testing talc for asbestos in 1971 by reviewing various corporate records, and he "also spoke[] to other individuals who worked at" WCD. Hubbard was then asked if he "obtained an understanding as to why" WCD began testing talc for asbestos in 1971. Plaintiff's counsel objected based on hearsay, and the court overruled the objection. Hubbard then indicated that he obtained his understanding based on his review of certain records and his "personal knowledge from the people who work[ed] there at the time." Plaintiff's counsel again objected, but the court overruled the objection. Ultimately, the court permitted Hubbard to testify that WCD instituted a testing program for asbestos in talc in 1971 in response to "the

37

interest of the FDA," which was detailed in newspaper articles that were in WCD's "clipping file."

We agree with plaintiff that the court erred in permitting Hubbard's testimony explaining his understanding as to why WCD entered into a talc testing program in 1971. His response was clearly not based on his personal knowledge—he was not employed by WCD in 1971 when the testing began—was founded on what others told him, and does not fall within any exceptions to the hearsay rule. Defendants' assertion the testimony was admissible based on Hubbard's status as the corporate representative finds no support in our Rules of Evidence.

Plaintiff also objected to Hubbard's testimony that it was "always [his] understanding" that WCD first learned of the potential risk of asbestos contamination of talc when the "articles appeared in the newspaper . . . and the FDA took an interest." The court overruled the objection, supporting its determination by stating "It's cross." We again agree the court erred. Based on the context of the questioning, Hubbard's testimony constituted inadmissible hearsay because he was not employed by WCD in 1971, his "understanding" was therefore necessarily based on what he learned from others, and WCD fails to demonstrate the testimony is otherwise admissible under any exception to the

hearsay rule. See Neno, 167 N.J. at 584-85 (explaining that a witness cannot indirectly incorporate hearsay into a statement of opinion or understanding).

The court similarly erred by permitting Hubbard to testify, over plaintiff's objection, that WCD never made a decision about the methods used by their outside labs to test talc based on cost, and that WCD sent letters to certain of its talc suppliers in 1972 concerning the results of talc testing. In both instances, Hubbard testified solely about events occurring prior to his employment based on what he learned from others, and none of the testimony falls within an exception to the hearsay rule.

We also consider whether the admission of those portions of Hubbard's testimony to which plaintiff objected constitutes harmless error—that is, was it clearly capable of producing an unjust result. R. 2:10-2; see Toto v. Ensuar, 196 N.J. 134, 144 (2008). We conclude it was not. Hubbard's extensive admissible testimony, supported by numerous WCD records that were admitted in evidence, otherwise showed no record of WCD testing for asbestos prior to 1971, the FDA expressed concern about the presence of asbestos in 1971 and became actively involved in developing a protocol for the reliable testing for asbestos at that time and during the following years, and WCD began at least some testing of its talc as early as 1971 and thereafter continued testing some of its talc and participated

in CTFA's efforts to coordinate with the FDA to develop an acceptable testing protocol. Thus, in our view, there was ample evidence, independent of Hubbard's inadmissible hearsay testimony, establishing WCD's talc testing history, its alleged knowledge of the possibility that its talc might contain asbestos, and its use and consideration of various testing methods. As a result, we are unable to conclude that Hubbard's hearsay testimony to which plaintiff objected, that related to WCD's lack of testing prior to 1971 and the reasons WCD began its testing in the early 1970s, was clearly capable of producing an unjust result. R. 2:10-2; see, e.g., Rice v. Miller, 455 N.J. Super. 90, 107-08 (App. Div. 2018).

We also consider plaintiff's challenge to the admission of portions of Hubbard's testimony to which no objection was made at trial. We generally do not consider issues raised for the first time on appeal, see Zaman v. Felton, 219 N.J. 199, 226-27 (2014), and for that reason alone reject plaintiff's challenge to the portions of Hubbard's testimony to which plaintiff chose not to object at trial. Plaintiff's decision not to object deprived the trial court of an opportunity to address the objection and prevented defendants from further developing the record supporting admission of the testimony and from presenting other evidence in place of the testimony plaintiff now contends was inadmissible. See

State v. Witt, 223 N.J. 409, 419 (2015).  Moreover, the record shows plaintiff ably and consistently objected to other portions of Hubbard's testimony based on hearsay grounds, and plaintiff's failure to do so with regard to the portions of Hubbard's testimony about which he now complains bespeaks a conscious trial strategy.

In any event, we consider whether the portions of Hubbard's testimony to which plaintiff did not object constituted inadmissible hearsay and, if so, whether its admission constituted plain error.  R. 2:10-2.  Plaintiff asserts Hubbard provided inadmissible hearsay testimony concerning the reasons WCD "start[ed] to test talc for the presence of asbestos in 1971, seven years before Hubbard began his employment with the company."  Hubbard testified that WCD began testing because it wanted to determine "if there's a possibility" of "a problem with the product," it had an obligation to make sure the product was not "defective," and it did not want to sell a product that would "ruin [WCD's] reputation."  Plaintiff also claims Hubbard improperly offered hearsay testimony that prior to Hubbard's employment with WCD, it would not have sold talc that tested positive for asbestos, it would have destroyed any talc that tested positive for asbestos and that it never sold Shulton any talc that tested positive for asbestos.

Based on our review of the record, Hubbard's testimony about the reasons WCD began testing for asbestos and as to what WCD did or would have done with talc that contained asbestos appears to constitute inadmissible hearsay because it is untethered to Hubbard's personal knowledge. Again, Hubbard did not become employed at WCD until 1978, and his knowledge concerning what occurred before his employment necessarily was derived from others. We note that plaintiff's failure to object deprived defendants of an opportunity to establish that Hubbard's testimony was either based on admissible business records or otherwise admissible under the exceptions to the hearsay rule. In any event, even accepting Hubbard's testimony as inadmissible hearsay, which we conclude it was based on the record, we are not convinced its admission was clearly capable of producing an unjust result. R. 2:10-2.

Hubbard provided lengthy and detailed admissible testimony, to which no objection was made at trial and no challenge is made on appeal, concerning WCD's testing of talc for asbestos in the years prior to his employment. That testimony consisted of his detailing of WCD records, which were admitted in evidence, that he reviewed in his capacity as WCD's corporate representative. In general terms, the records showed, and Hubbard explained, WCD's interactions with the FDA during the 1970s; WCD's interactions with various

testing laboratories that it used to test its talc during the 1970s; various tests of WDC talc during the 1970s, including one in 1972 showing the presence of tremolite and chrysotile; WCD's participation in CTFA meetings during the 1970s dedicated to addressing the testing of talc for asbestos; and the back-and-forth between CTFA and the FDA in 1973 and thereafter concerning the development of a reliable test for the presence of asbestos in talc.

That testimony, as well as the testimony of the other witnesses, including plaintiff's experts, about similar subjects throughout the long trial provides the context in which we determine that Hubbard's hearsay testimony was not clearly capable of producing an unjust result. Indeed, we can properly infer from plaintiff's failure to object "that in the context of the trial" the errors about which he now complains were "actually of no moment." State v. Macon, 57 N.J. 325, 333 (1971). Moreover, the reasons Hubbard provided for WCD's decision to test for asbestos and his testimony that WCD would have destroyed any cosmetic talc in which it found asbestos was not clearly capable of producing an unjust result because plaintiff's claim was founded, at least in part, on Linda Fishbain's exposure to asbestos-contaminated talc in Shulton's products on a daily basis beginning in 1965, six or seven years prior to any testing of the talc for asbestos. Thus, Hubbard's testimony about the reasons testing commenced and that WCD

would have destroyed talc that tested positive for asbestos is irrelevant to that portion of plaintiff's claim founded on what occurred from 1965 through WCD's testing in 1971.

Hubbard's testimony about the reasons the testing began was not capable of producing an unjust result because there is otherwise evidence, in the form of WCD records, that the testing commenced in 1971, after the FDA expressed concern about the presence of asbestos in talc and the appropriate testing methodology. Last, Hubbard's testimony about what WCD would have done if a test showed asbestos in its talc was not clearly capable of producing an unjust result because there was no evidence WCD actually tested all of the talc it sold to Shulton after 1971, Hubbard never identified any cosmetic talc that WCD actually destroyed in response to a test showing the presence of asbestos, and Fitzgerald presented detailed testimony explaining that the source mines for WCD talc, as well as Shulton products that Linda Fishbain allegedly used and was exposed, were "regularly and consistently contaminated with asbestos" from 1955 to 1980.

We are also not convinced that the cumulative effect of Hubbard's hearsay testimony, including that to which plaintiff did and did not object, was clearly capable of producing an unjust result. For the reasons noted, plaintiff makes no

showing that any of the testimony, when considered in the totality of the evidence presented at trial, was clearly capable of producing an unjust result here. The parties presented substantial evidence, including comprehensive and detailed expert testimony, supporting their respective positions and addressing the allegation that Linda Fishbain's mesothelioma was caused by her exposure to asbestos in the allegedly contaminated Shulton products that she used and to which she was exposed. In our view, Hubbard's challenged testimony added little, if anything, of import that might have affected the jury's determination of the complex issues presented. We reject plaintiff's conclusory contentions to the contrary.

IV.

Plaintiff next argues the court erred by ruling during a pretrial proceeding that counsel for Colgate Palmolive could show the jury a slide of a redacted version of the 1986 letter from the FDA that was written in response to a citizen's petition requesting asbestos warnings on talc products. Plaintiff also claims the court erred in its jury instructions on the proper consideration of the letter. Plaintiff claims the letter "created the misleading impression that the [FDA] had approved the absence of warnings about the dangers of asbestos on Shulton products during the period of Linda Fishbain's exposure."

Prior to trial, plaintiff objected to counsel for Colgate Palmolive's plan to show a portion of the letter to the jury during opening statements. Plaintiff argued that "[p]utting aside the hearsay problems with" the letter, it "postdate[d]" the period during which Linda Fishbain allegedly was exposed to asbestos-contaminated talc. The court did not make any legal conclusions supporting its decision on the objection but implicitly overruled it, stating only that counsel "could argue to the jury" and that if defendants "don't meet the proofs then [plaintiff] can argue that to the jury."

At trial, none of the various defendants moved the letter into evidence. Instead, plaintiff's counsel first mentioned the letter to the jury during his opening statement, questioned a series of his witnesses about it and later moved the letter into evidence over the objections of the various defendants. Plaintiff now claims it was error for the court to admit the letter.

"[T]rial errors that 'were induced, encouraged or acquiesced in or consented to by . . . counsel ordinarily are not a basis for reversal on appeal.'" State v. Munafo, 222 N.J. 480, 487 (2015) (quoting State v. A.R., 213 N.J. 542, 561 (2013)). As our Supreme Court has explained, the invited error doctrine "gives voice to 'the common-sense notion that a "disappointed litigant" cannot argue on appeal that a prior ruling was erroneous "when that party urged the

lower court to adopt the proposition now alleged to be error."'" Ibid. (quoting A.R., 213 N.J. at 561). Here, we consider whether plaintiff's claim the court erred by admitting the letter must be rejected under the invited error doctrine because plaintiff moved for admission of the letter over the objections of the various defendants at trial.

Plaintiff argues he did not waive his right to challenge the admission of the letter because his counsel was compelled to mention the letter during opening statements and move for its admission because the court ruled Colgate Palmolive's counsel could show a portion of the letter to the jury during openings. Plaintiff relies on Saldana v. Michael Weinig, Inc., where the trial court denied the plaintiff's application to crop a photograph of the machine that caused the plaintiff's injuries, and the plaintiff later moved for admission of the uncropped photograph into evidence. 337 N.J. Super. 35, 44-46 (App. Div. 2001). We rejected the defendant's claim that the plaintiff's request to admit the photograph at trial constituted a waiver of the plaintiff's right to challenge the court's rejection of the plaintiff's motion to crop the photograph. Id. at 47-48. We held that because "[a] party who objects to the admission of evidence is bound by an adverse ruling for the remainder of the trial . . . [he or she] is entitled to minimize the effect of the ruling by taking a contrary position without

waiving, for the purposes of appeal, the prejudicial effect of the introduction of the entire subject matter over which the initial objection was made." Id. at 47. We concluded that the "admission of the uncropped photograph, based upon the adverse ruling of the trial judge, did not represent a waiver of [the plaintiff's] initial objection" to the uncropped photograph's admission into evidence. Id. at 47-48 (emphasis added).

Whether the holding in Saldana should bar plaintiff from challenging the admission of the 1986 letter is not easily resolved here because the court's lack of legal findings renders unclear whether its determination that counsel for Colgate Palmolive could show a portion of the letter to the jury during opening statements constituted a determination the letter was admissible as evidence at trial. If the court's decision constituted a finding the letter was admissible as evidence, plaintiff's strategy of addressing the letter his opening statement and moving for admission of the letter into evidence did not result in a waiver of his right to argue on appeal the court erred by admitting the letter in the first instance. Id. at 47-48.

Based on our review of the record, we are convinced the court's decision to allow Colgate Palmolive's counsel to show a portion of the letter to the jury

during opening statements effectively constituted a decision to admit the letter[16] into evidence at trial. Plaintiff's objection to Colgate Palmolive's counsel's plan to show the jury a portion of the letter was based on evidence principles and not those pertaining to the proper scope of opening statements. See Morales-Hurtado v. Reinoso, 457 N.J. Super. 170, 191 (App. Div. 2018) (explaining that the "narrow purpose and scope" of an opening statement is to explain "what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole" (citation omitted)). In plaintiff's objections to Colgate Palmolive's planned use of the letter during opening statements, his counsel expressly referenced hearsay problems and issues of relevancy, N.J.R.E. 403, claiming the letter detailed FDA actions occurring after Linda Fishbain's exposure to talc.

In addition, we can reasonably conclude that, presented with plaintiff's express objections, the court would not have allowed counsel to show the jury a document during opening statements unless the court had decided the letter was admissible in evidence. That does not mean the court's determination was

---

[16] None of the parties argue that because Colgate Palmolive requested permission only to show the jury a portion of the letter that admission of the letter, if appropriate, should have been limited only to that portion. The parties do not dispute that proper admission of the portion of the letter permitted admission of the balance of the letter.

correct; it means only that the record supports a conclusion that the court's decision constituted a determination the letter was admissible. Plaintiff's counsel certainly understood that to be the case; he supported his request for admission of the letter by arguing that Colgate Palmolive had been permitted to "open" on the letter over plaintiff's objection. In other words, plaintiff argued that the letter was admissible because the court had already determined that it could be shown to the jury. Neither WCD nor Shulton refuted that contention.[17]

In sum, a fair reading of the record shows the court's determination that Colgate Palmolive's counsel could show a portion of the letter to the jury during opening statements constituted an implicit rejection of plaintiff's objection to the admission of the letter and a determination the letter was admissible as evidence. As a result, we are not persuaded that plaintiff's counsel's decision to refer to the letter in his opening statement and later move it into evidence resulted in a waiver of plaintiff's right to claim admission of the letter was in error. Saldana, 337 N.J. Super. at 47-48. We therefore address plaintiff's claim

---

[17] We acknowledge that due to apparent difficulties in the transcription of the trial record, it is not clear which counsel spoke during the colloquy over the objection to plaintiff's request to admit the letter in evidence and that much of the substantive exchange is identified only as "indiscernible." We glean as much as we can from the sparse record.

the court erred by determining the letter was admissible in the first instance and whether its admission was clearly capable of producing an unjust result.

Because of the manner in which the letter was first addressed by the court and later admitted into evidence based on plaintiff's request, determination of the admissibility of the letter rests on an almost non-existent record. The court did not conduct a Rule 104 hearing on its admission and thus the record related to its admission is limited to what appears to be the letter's contents and the parties' apparent acceptance of its authenticity. The letter is dated July 11, 1986, and bears the purported signature of the then "Acting Associate Commissioner for Regulatory Affairs" of what the parties apparently concede is the FDA. The letter is not typed on FDA letterhead and bears no seal or certification as to its origin or authenticity.

Shulton and WCD relied on the letter to establish the truth of its contents. They relied on the letter's statements that the FDA had never required a warning on talc products, the FDA questioned the reliability of analytical methods for testing talc for the presence of asbestos during the early 1970s, and "the quality of cosmetic talc significantly improved, and that even when asbestos was present, the levels were so low that no health hazard existed." Because the letter

51

was relied on by Shulton and WCD, at least in part, to establish the truth of its contents, it constituted hearsay. See N.J.R.E. 801.

Neither WCD nor Shulton cite to any exception to the hearsay rule permitting the proper admission of the letter. The record does not permit a determination whether admission of the letter properly falls within any exception to the hearsay rule. Although authentication of the letter might have been accomplished through appropriate testimony, see State v. Moore, 158 N.J. Super. 68, 83 (App. Div. 1978), or otherwise by self-authentication, see N.J.R.E. 902(b) and (d), the parties' apparent concession it was authentic does not render it admissible. Rather, because defendants relied on the letter for the truth of its contents, it was not admissible unless it was both authentic, N.J.R.E. 901, and there was a showing that the letter satisfied the requirements of Rule 803(c)(8) as a public record, report or finding. N.J.R.E. 803(c)(8). The record, however, is bereft of any evidence satisfying the Rule's requirements: there is no evidence the statements in the letter are "within the scope of the [author's] duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement." Ibid. We therefore conclude, based on the record, the letter constituted inadmissible hearsay.

Nevertheless, we are not persuaded admission of the letter was clearly capable of producing an unjust result. R. 2:10-2. The letter's statement indicating the FDA had never required warnings for talc products pertains to a fact that is otherwise undisputed, and plaintiff did not present any evidence showing the FDA required a warning on talc products during Linda Fishbain's alleged period of exposure to Shulton's products. Similarly, the letter's statements concerning the unreliability of the testing methodologies used during the 1970s and the FDA's efforts to develop a reliable methodology was also the subject of extensive other testimony and evidence.

The letter's reference to the improved quality of talc during the "latter portion of the 1970s" and the FDA's apparent finding that the levels of asbestos in talc found during that period did not create a health hazard relates to only a small portion of Linda Fishbain's alleged period of exposure to contaminated talc. Moreover, that statement is undermined by the numerous other statements in the letter that supported plaintiff's position at trial and upon which plaintiff relied at trial. For example, the letter states that: "asbestos inhalation over extended periods is hazardous to humans"; the FDA is "aware that some cosmetic talc produced in the 1960s and early 1970s did contain asbestiform minerals;" "[d]uring the early 1970s, [the] FDA became concerned about the

possibility that cosmetic talc did contain significant amounts of" asbestiform materials and, during that time, "the analytical procedures for determining asbestos in talc were not fully developed"; and "[b]ecause of the questionable nature of the analytical results, the [FDA] was not able to assess reliably the levels of asbestiform minerals in cosmetic talc then in the marketplace." In other words, the letter confirmed many of plaintiff's most important factual claims: asbestos is hazardous to humans and during Linda Fishbain's daily exposure to the talc from the mid-1960s until the late 1970s, the FDA, cosmetic talc industry and defendants had no reliable methodology to determine the level of asbestos contained in cosmetic talc products. We therefore do not find that admission of the letter was clearly capable of producing an unjust result. R. 2:10-2.

We also reject plaintiff's claim the court erred in its instruction to the jury concerning its consideration of the letter. Plaintiff contends the court erred by instructing the jury that it could consider the FDA's failure to require asbestos warnings when deciding whether Shulton's products were unsafe.

The court charged the jury as follows:

> Defendants have offered evidence that the [FDA] considered whether to require warnings on cosmetic talc products for asbestos-related dangers and determined that no warning was necessary. There is no dispute that there was no regulatory requirement that any of the defendants include a warning with its

products.

> Plaintiffs dispute the basis of the FDA's decision and contend that regardless of the FDA's decision a warning was still required. The absence of an FDA requirement that a warning be given, however, does not mean necessarily that the product needed no warning. It is, however, something you may take into consideration.

Clear and correct jury charges are necessary for a fair trial and a court's failure to provide them may constitute plain error. Das v. Thani, 171 N.J. 518, 527 (2002); Wade v. Kessler Inst., 172 N.J. 327, 341 (2002). Jury charges outline the jury's function, set forth the issues, state the applicable law, and spell out how the jury should apply the legal principles to the facts. Wade, 172 N.J. at 341. An appellate court will not disturb a jury's verdict based on an instructional error, "where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect." Ibid. (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)).

Plaintiff argues that the instruction was misleading "because it implied the FDA had approved Shulton's decision to omit any warnings about the dangers of asbestos in its products during the period those products were used by Linda Fishbain and other members of her family." The claim lacks merit because the instruction does not suggest or imply that the FDA approved the omission of

warnings on Shulton's products during the time of Linda Fishbain's exposure to the allegedly asbestos-contaminated talc. Indeed, plaintiff's counsel repeatedly questioned witnesses about the FDA's statement that some cosmetic talc in the 1960s and 1970s contained asbestiform minerals and argued during summation that the FDA never said cosmetic talc was always free from asbestos contamination. Plaintiff's counsel reminded the jurors that the FDA letter said only "the talc in 1986 is clean." The court's instruction therefore could not have misled or confused the jury. Ibid.

In addition, the court tailored the instruction to provide a fair description of the position of all parties and allow the jury to consider the evidence, including the FDA letter. It is presumed that the jury followed the court's instructions. State v. Loftin, 146 N.J. 295, 390 (1996); Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013). There is nothing in the record to suggest the jury failed to do so. And, in our view, the instruction accurately described the parties' respective positions.

Any other arguments made on plaintiff's behalf that we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION